[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
By pleadings originally filed in Stamford Superior Court, Juvenile Matters on December 26, 1990 and last amended October 22, 1991, the Department of Children and Youth Services (DCYS) alleges Brittany M., born April 8, 1988, to have been abused by Angela M., her mother and sole legal guardian in the absence of a named father. At the same time, by amendment granted February 27, 1991, the petitioner seeks to terminate the CT Page 5262 mother's parental rights for all three of the nonconcensual grounds set forth in subsection (b) of 17a-112 of the Conn. Gen. Statutes (Rev. 1991) which apply to children not previously found to have been neglected or uncared for. The matter was transferred to this court on motion granted May 22, 1991 and thereafter, on June 27, 1991, the petitioner's motion for psychological and psychiatric evaluations of mother and child, which had previously been granted in Stamford on January 3, 1991 but never accomplished, was again granted. Following receipt of these evaluations, dates certain were set at a pretrial conference on October 3, 1991, and on February 26, 1991 — 14 months after the originally pleaded abuse of Brittany — all sides rested and the parties given to March 27, 1992 for the filing of trial memoranda and corrections thereto. A motion for a transcript of the testimony at four days of trial (November 13, 1991, January 8, 1992, February 13, 1992 and February 26, 1992) was denied on March 18, 1992 on the ground that it would unduly delay the rendering of a decision and incur needless expense to the state in view of the fact that counsel were given permission to audit the tapes of these hearings. Counsel were, however, given until April 3, 1992 for the filing of trial memoranda, at which date the period of reserved decision is deemed to commence.
FACTS
Evidence offered at four trial days supports the finding of the following facts:
Angela M., the sole respondent herein, was raised by a foster mother in Jamaica until the age of 14 when she came to the United States to live with her mother who had been too young at the time of Angela's birth to assume responsibility for her care. After a year, problems between Angela and her mother caused the latter to send Angela back to Jamaica where she gave birth in May of 1983 to the first of five children born out of wedlock with different paternities in the next eight years. In 1984, Angela, having just turned 18, returned to Connecticut alone, leaving her then ten month old daughter in Jamaica where the child has lived with her father (currently her stepmother during her father's army service) ever since.
After a second unsuccessful attempt to live with her mother, Angela again moved out, this time staying in Connecticut where she gave birth to her second child in January of 1985. She voluntarily relinquished custody of that child to her mother in the Probate Court. Although intending to keep physical custody of a third child born to her in November of 1986, Angela placed him in foster care following loss of her apartment in a fire. CT Page 5263 When no timely plan was made for resuming his care, DCYS filed neglect petitions, and on August 5, 1987, in Stamford Superior Court, he was found to have been both neglected and uncared-for in a hearing at which Angela failed to appear. The following year, again by default, her parental rights were terminated so that that child could be adopted by his foster parents. (State's Exhibit J. pp. 3-4). A month after her parental rights in that child were terminated, Angela gave birth to Brittany, admitting to drug use during the latter part of her pregnancy. (Id., p. 4.)
No father has been named or has acknowledged paternity, been adjudicated to be the father, appeared on her birth certificate as a named father or has played any role whatever in her life.
Because of her admitted drug use during her pregnancy with Brittany, services were offered to ensure that Angela would be able to provide that baby with adequate care. She was referred to a substance abusers group and offered the assistance of a parent aide. When Brittany was three months old, her mother was arrested for assault and DCYS took temporary custody, but soon returned the child to her mother who was then living in a temporary shelter. No referrals were received on this child for more than two years thereafter, but in October of 1990 Angela was again arrested, this time for having been observed kicking and verbally berating Brittany while on a shopping expedition in Caldors. Witnesses testified seeing the mother shouting loudly at the then two and one-half year old Brittany, hitting her with a five pound parcel which caused her to fall backwards onto an upward moving escalator. When she arrived at the top, instead of dropping her parcels and lifting the child to safety, Angela "lift-kicked" her off the top step. When the store's operations manager approached saying "You can't do that," Angela replied, "I can do what I like." (Testimony of Ray, November 3, 1991.) The manager testified she feared for her safety when approached by Angela who had been screaming and swearing at her. With the help of a security investigator, store personnel ". . . had to physically drag her out of the store" when she refused to leave. It took police officers summoned to the scene twenty minutes to subdue her they had to restrain her with leg shackles in order to remove her from the store. (Testimony of Perna, November 13, 1992.) Angela had been accompanied on this shopping expedition by her friend, Ms. B., who cared for Brittany when Angela was arrested. In her statement to the Stamford police, Ms. B, revealed having "seen her get upset and very violent several times". "I know she is real violent just as she was today. I hope she can get some help." (State's Exhibit B,.)
During the month that Angela was incarcerated following this CT Page 5264 incident, Ms. B. cared for Brittany. On her mother's release from prison November 28, 1990, Brittany was returned to the care of her mother who accepted the offer of DCYS to provide a Title 20 worker but rejected the offer of a parent aide whom she regarded as "too nosey". (Testimony social worker DeAngelo, November 13, 1991.)
A month later, DCYS learned that Brittany was in Stamford Hospital with burned feet which Angela had told hospital personnel had been accidentally caused when the child bumped into her as she was carrying a pot of boiling water. Two days later, however, Angela admitted that this was not true and that the burns were caused when, finding Brittany smearing feces, she had put the child into a tub with very hot water. Later Angela acknowledged to the social worker "I let my temper overrule my logic." Again Angela was incarcerated and this time Brittany was placed in a licensed foster home by DCYS which filed a neglect petition and secured an order of temporary custody that was confirmed on January 3, 1991.
Angela had originally told Officer Weed that Brittany had pulled boiling water off of the stove and thus had burned her feet. When the child, however, told the police officer that "My mommy burnt me. . . with some water," Angela stopped the officer's interview with Brittany. (State's Exhibit C., p. 2) Later the officer obtained a statement from Ms. B's 12 year old daughter who had observed the episode: On December 21, 1990, when Brittany had defecated in her clothes, her mother sent her upstairs. Later, having followed the child and observed smeared feces, she began to hit the child in the face with her hand, saying "Do you want me to kill you?" The witness saw Angela forcing Brittany's legs back into a tub of hot water and heard the child say "Mommy, hurt" to which Angela responded "Don't call me mommy." When Angela removed Brittany from the tub and saw the skin on her feet beginning to bubble, she brought her to the hospital. (Id.)
Social Worker Williams was on Careline duty December 21, 1990 and obtained a 96 hour hold pursuant to subsection (c) of17a-101 based upon the child's statements to the police, the confirming statement of the 12 year old witness, and the prior history of violence which included, in addition to the escalator episode, statements by Angela that she had once sprayed the child in the face with an aerosol can "but nothing happened", and that she had once hit a woman in the head with a lead pipe. (Testimony of Williams January 8, 1992). When Ms. Williams arrived at the hospital, Angela was "hysterical. . . cursing . . . screaming. . ." requiring the presence of police officers to escort her out of the hospital. On her way out, the officers warned the social worker not to CT Page 5265 leave the hospital without a police escort. (Id.)
After Angela's return to Niantic prison, a visit there was arranged for February 1, 1991. En route, Brittany confirmed that she was aware she was going to visit her mother in jail because "Mommy had burned her feet." (Testimony of Daymond, January 8, 1992.) Before a second prison visit, scheduled for March 8, 1991, could be held, Angela called DCYS on February 25, 1991 to say she was out of Niantic, in the Bridgeport YWCA and wanted a visit arranged for March 1, 1991. Told that a visit had already been scheduled for the following week and could not be rescheduled on such short notice, Angela, apparently angered at this rebuff, hung up and could not be reached at or through the Bridgeport YWCA Brittany was brought nonetheless for the scheduled visit on March 8, 1991 but the mother did not appear. DCYS heard no more from her and had no means of contacting her until she appeared in court on April 24, 1991 when she revealed her address for the first time in two months. At a visit arranged for May 7, 1991, Brittany appeared hesitant and Angela focused her attention on the child's physical appearance, criticizing her hair and skin. She inspected Brittany's feet and when she asked how she had been burned, the child responded simply, "You." (Id.)
In his evaluation of Angela conducted on September 3, 1991, psychiatrist Dr. Gianetti diagnosed her as having a bipolar disorder characterized by marked mood changes complicated by a "Mixed Personality Disorder (with Histrionic, Narcissistic; Antisocial, Borderline, impulsive, and immature traits)." (State's Exhibit E., p. 2.) He concluded that ". . . there is certainly a significant question regarding her competence to manage caring for her children at this time, probably even with significant supporting assistance." (Id.) He enlarged upon this in testimony on January 8, 1992, pointing out Angela's poor interpersonal relationships, her difficult lifestyle and inability to learn from past mistakes. Her temper, easily lost, could be triggered by no great degree of stress. Angela evidenced inconsistency between her expressed wish to have Brittany returned and reality — her admitted lack of an appropriate home for her, eight months after Brittany's removal from her care. Her narcissism complicates her ability to emphasize with a child, to perceive a child's needs and meet them. The amenability of such a personality disorder to treatment depends upon how deeply ingrained it has become and the extent of a patient's motivation to change. Dr. Giannietti saw no such motivation in Angela and predicted that even if motivated it would take years to effect sufficient change so that her propensity to overreact to stress caused by caring for Brittany would be reduced to a level where the child could be safely returned to her care. So long as Angela continues to CT Page 5266 blame others for all her problems and avoids accepting responsibility for them, there is no likelihood of change. Her continued minimization of the severity and dangerousness of her past conduct "doesn't bode well for change."
Social worker Powell testified on January 8, 1992 that in the six months since Angela gave birth to her fifth child on May 21, 1991, she and the infant had moved four times, twice having had to move following altercations with others in the shelters or apartments where they were living. In that period, six visits with Brittany had been scheduled and taken place; three others were scheduled and cancelled, and on one occasion (September 18, 1991), Brittany was brought to the office but the mother failed to appear and thereafter did not request another visit for over a month.
Clinical Psychologist, Dr. R. S. Welsh, evaluated Angela with both Brittany and her youngest child born two months before the July 25, 1991 evaluation. He came to the conclusion — based on Angela's own account of her current life — that it was ". . . clear that the patient continues to engage in impulsive, immature-type behavior." (State's Exhibit H, p. 5.) He found Angela to be "highly suspicious", seeing even the mother figures as "highly aggressive" and responding to discipline with "counter violence". (Id.) Angela appeared to him to be "a very obsessive individual who has very little stress tolerance." (Id.) At the age of 25, she continues to physically fear her own mother, making it likely that she would "exhibit similar over-controlling behavior with her own children." (Id.)
 With a high level of unresolved anger, poor impulse control and a general pattern of emotional immaturity, obsessive-compulsive behavior (the lack of ability to tolerate any imperfections in her children) and the modeling of violence from her own mother suggests the patient would still present a risk to her daughter if her daughter were returned home. . . . The patient's ability to change this pattern of behavior, which now appears to be a lifestyle, is likely to be very difficult to do. . . Testing reveals a troubled individual who is a self-admitted recovering crack user, had a very troubled childhood and claims that her mother will even "beat" her now if she makes her mother angry. Testing reveals a compulsive personality, poor impulse control, unresolved anger and a woman who is seeking quick solutions to her problems. The patient probably presents a continuing risk to her daughter. . . (Id. p. 6.) CT Page 5267
Observing Angela and Brittany interacting, Dr. Welsh summarized the child's ". . . behavior around her mother. . . to be that of inhibited cautiousness." (State's Exhibit I, p. 4.) In testimony on February 13, 1992, Dr. Welsh gave his opinion that the prognosis for Angela to change was "very poor" because of her long history of personal conflicts with so many different people. Since children need much tolerance, if Brittany were to return to her mother, Angela's inflexibility, compulsiveness, lack of impulse control, low threshold of irritation and stress tolerance, he predicted, would result in a situation that would be "difficult at best; pretty disastrous at worst". Having been physically abused twice in two months at the end of 1990, Dr. Welsh could "practically guarantee" there would be further such episodes — perhaps after a "honeymoon" phase — if Brittany were returned to her care, especially as the child, growing older, would be seeking even further autonomy. He recommended Brittany's placement in a safe environment where she would feel free to "decompress" without fear of punishment, and where she would feel secure. Even if Angela were to acknowledge the need to change and invest in counselling and cooperation with helping agencies, it would take years before there could be any real change. The record affords no evidence, however, that Angela acknowledges the need for change; Referred to the Regional Network of Programs for assessment of her substance abuse problem — which Angela claimed had been under control since February of 1988 — she failed to attend more than two intake appointments, cause the counselor Maureen Gallagher, to conclude:
. . . we cannot evaluate her for Substance Abuse because she reports to us that she is not willing to attend RCS for our required six visits and urinalysis.
(State's Exhibit G; testimony of Gallagher February 13, 1992.)
Testifying in her own behalf, Angela described the violence and repeated rejection known in her own childhood being repeated in the lives of her children: Her mother had disciplined her as she did Angela's brother by beating her — "the Jamaican way" — which Angela accepted since "If I ever got a beating I deserved it." (Testimony of February 13, 1992). Having left her first child, Jolene, behind in Jamaica at the age of 10 months, Angela described a brief period later when Jolene had joined her in Connecticut when Brittany was an infant. That interlude ended after a violent altercation with a neighbor resulted in Jolene's return to her father and eventual return to Jamaica. Angela "gave" her second child to her own mother to raise when, soon after giving birth, she became pregnant with a third child. Immediately after the CT Page 5268 birth of her third child and first son, her apartment burned and Angela returned to live with her mother who became the recipient of welfare checks for both children. During this period Angela went to prison: "I started hanging out. . . I was always getting into trouble with my boyfriend's girlfriends." On her release, her mother "kicked me out" and Angela gave DCYS voluntary permission to place her son in foster care for 90 days. Instead of retrieving him after that period, she started "doing drugs" and DCYS filed a petition alleging the boy to be neglected and uncared for. Angela failed to appear at any of the court hearings on that child, resulting in his commitment to DCYS in August of 1987. (Stamford Superior Court, Juvenile Matters.) After 10 months, during which Angela had only visited him once, DCYS filed a petition to terminate her parental rights. After three scheduled hearings at which, again, she failed to appear, her parental rights were terminated and in September of 1989, his adoption by his foster family since infancy was finalized. (Id.) In her testimony, Angela acknowledged she had been aware of these proceedings, but claimed that her mother had "talked me into consenting" to the child's adoption, notwithstanding court records establishing abandonment as the nonconsensual basis for terminating her parental rights.
According to Angela, she started using crack cocaine in 1987 but stopped in February of 1988, two months before Brittany's birth. During Brittany's infancy, Angela described a nomadic existence, her residence changing every few months as a result of altercations with landlords, hosts or other proprietors of the places where she lived. She first lived with a friend who "exploited" her by making her pay half the rent and act as a "live-in maid". In discussing the episode with Brittany on the escalator, she claims to have merely "lifted" the child off the escalator with her foot to avoid an accident — "I used my foot to boot her out of the way" (Testimony of February 26, 1992) — but did not explain why she could not have relinquished her parcels in order to lift the child with her hands. She accused the store personnel of stopping the escalator, not to save Brittany but in order to "trap me" and explained her "cussing" and struggling with security guards as "my natural instinct. . . to fight back" when "three goons jumped me". (Testimony February 13, 1992.) Regarding the burn episode, Angela admitted that when she found that Brittany had defecated on herself and "decorated the bathroom", she had removed the child's pants, spanked her and put her in the bathtub with the tap running. She claims to have removed the child from the tub as soon as she complained of the water being hot, but could not account for the resulting second degree burns. She admitted lying initially about the cause of the burns because "I had to lie. . . they were going to think I did it on purpose." (Id.) CT Page 5269
At the time of testifying, Angela was living in her own apartment for the first time in six years, and reported herself to be "In control of my temper, my life and everything else." Asked why she had not visited Brittany for three months in 1991 during the pendency of this action, she explained that she had taken a live-in job for which she was "paid under the table" in order to pay a $1500 phone bill incurred by "these people" who came into her room when earlier living with a "friend," in order "to make 900 calls" on her telephone. She recounted several incidents of violence with that "friend's father during which she had received two stab wounds. While stating she would "do anything" to get Brittany back, she acknowledged not completing the six-week drug screen at the Regional Network after having had to wait for her third appointment and getting "ticked off at it." Her most recent arrest, in January 1992, was for failing to appear in connection with an earlier episode involving her "present son's father" who called police after Angela came home, found him in bed with another girlfriend, and threw the latter "through the door". (Id.)
On February 26, 1992 Angela gave a variety of excuses for failing to cooperate with recommended programs: She did not report to her probation officer the day before testifying because it had been raining hard; she failed to attend parenting classes in Bridgeport because her baby was sick, adding later that she did not know where the program was held; the parent aide, who was supposed to come to see her to transport her to those classes, never came; she had no money for bus fare but had never asked DCYS for money for this purpose; her baby "is constantly sick" which prevents her from leaving her apartment; she had to leave the apartment to pick up her check on the days of the parenting classes; she was "in a bad mood"; she was moving. After listing these varied excuses, Angela added "I really don't think I need parenting I need parenting classes. I am a good mother. I know how to take care of children. I think I'm a very good mother." Her opinion of the various professionals with whom she was involved was less commendatory: "These state workers are never where they are supposed to be." Her probation officer did not provide a substitute when on vacation to whom she could report, did not return phone calls. "They do everything on probation backwards." On February 26, 1992 she also could not recall when she had last visited Brittany, but did recall cancelling a visit on January 16, 1992 because of being "in a bad mood". She complained that while the State workers "are supposed to help you", when you go they say "state workers can't do that." She complained, tearfully, that "they use everything against me," and accused DCYS of "shafting" her while acknowledging that at various times in the past DCYS workers had provided her CT Page 5270 with food, furniture, money and bus fare.
In rebuttal, the current DCYS social worker testified that Angela called for rides like a "taxi service", became angry at the worker when requests for transportation could not be met. The most recent visit with Brittany had passed without incident, but on the ride home she became upset, sobbed and seemed to "pass out" in a deep sleep. Angela was told that transportation to parenting classes would always be provided upon request and the parent aide went twice to Angela's home by prearrangement only to find Angela unavailable.
Adjudication — On facts as of October 22, 1991 (date petition last amended)
The evidence provides a clear preponderance of evidence that on two occasions in a two month period at the end of 1990, Brittany M. was an abused child in that she suffered injuries by nonaccidental means. On both occasions — after kicking the child off the top of a running escalator and after the child suffered second degrees burns after being forced into hot water — Angela M. was criminally convicted for the acts which resulted in the injuries.
This record also supports by clear and convincing proof a finding that Brittany M., on both occasions, was denied by acts of parental commission the care, guidance or control necessary for her physical and emotional well-being. On the second occasion the resulting nonaccidental or inadequately explained serious physical injury constitutes, as provided by subsection (b) of 17a-112, prima facie grounds for the termination of Angela's parental rights. The other two grounds pleaded in the petitioner's amendment of October 22, 1991, must be dismissed for failure to be established by the requisite standard of proof: While Angela's failure to visit Brittany for three months during the pendency of this matter might support the conclusion that her motivation to resume care of this child is questionable, it does not rise to the level of abandonment as grounds to terminate parental rights. And while Brittany had been out of her mother's care for 10 months as of the time of the adjudicatory date, during which she had infrequent visits with her mother, the evidence is not clear and convincing that Brittany has no present positive feelings or emotional ties with her mother as required by the gloss put upon the statutory definition of "no parent-child relationship" by the holding in In Re: Jessica M., 217 Conn. 459 (1991).
Disposition — On facts as of February 26, 1992, (final day of trial) CT Page 5271
Between the adjudicatory and dispositional dates, little had changed: Angela's contacts with Brittany continued to be infrequent, with increasing distress to the child. Angela continued caring for her youngest child, born in May of 1991, but describes him as "always" being sick. Angela continues to maintain she is, and always has been, a good mother and therefore is in no need of parenting instruction. She continues to be embroiled in the criminal justice system because of a volatile temperament which leads to physical altercations with a wide variety of people. She denies all drug use but refused to complete a requested drug assessment to confirm this.
Before parental rights may be terminated, however, the court must consider and make findings as to the six factors set forth in subsection (d) of 17a-112:
(1) Numerous services were offered and provided to Angela during the 14 month pendency of this action: Parenting classes, parent aide services, drug screening were all offered and were all rejected, except for utilization of transportation on certain occasions. Food, furniture, and other necessities were provided when requested. Without consistent visitation and the acknowledgement of a need to change past parenting practices, the provision of still further services would be an empty gesture.
(2) No court orders were entered into except for Angela to attend court hearings, which she did on the instant petitions. While not orders, Angela did agree with DCYS to participate in certain services during the pendency of this action — parenting classes; parent aide; drug screening — but followed through on none of them.
(3) No evidence was offered as to the child's significant emotional ties with her current caretaker, who has had her care for less than one year. The feelings and emotional ties with her mother, which Dr. Welsh found to display "inhibited cautiousness" (State's Exhibit I, p. 4.) in July of 1991 evolved in the seven months following into an apparent depression, resulting in extended sobbing and uncharacteristic deep sleep following the most recent visit.
(4) Brittany, on the dispositional date, was nearly four, having spent the last 14 of her 46-month life in continuous foster care. She needs the assurance of a safe and permanent home without further delay before she enters the wider world of public school. CT Page 5272
(5) Angela has made no apparent effort to adjust her circumstances, conduct or conditions to make it in Brittany's best interests to return to her care in the foreseeable future. Angela has visited the child infrequently, her failure to visit being ascribed to a wide spectrum of unconvincing reasons. Angela acknowledges no parental failings while caring for Brittany, absolves herself of responsibility for all incidents of parent abuse, projects blame on a wide variety of others, and see no need to change.
(6) No one has prevented Angela from maintaining a meaningful relationship with Brittany during her 14 months in foster care. Failing to provide a visit immediately upon demand on one occasion is not unreasonable when a visit was scheduled for the week following. Even Brittany's evident distress after the last visit with her mother did not cause DCYS to limit visits; only Angela's failure to ask for subsequent visits caused the infrequency of contact.
Having considered the foregoing, it is found by clear and convincing proof to be in Brittany's best interest for the parental rights of her mother and, lacking a named father, her sole legal guardian, to be terminated so that she may know at last, after a lifetime of unsettled caretaking — two and one-half years of violence, mobility and abuse while with her mother; 14 months of the uncertainty of foster care after removal from her mother's care — the secure nurturing of a safe adoptive home. Therefore, it is ORDERED that the parental rights of Angela M. in and to her daughter Brittany M. be, and hereby are, terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the child forthwith in adoption, and to secure that end such Commissioner is ORDERED to submit to this court no later than 90 days following the date of this judgment a written report as to the progress of such adoption. If adoption is not finalized by September 15, 1993, the said Commissioner is further ORDERED to submit a Motion to Review Plan for Terminated Child on that date to ensure full conformity with federal law.
Appeal
Angela M. has 20 days from the date of this judgment in which to take an appeal. If she requests an appeal and her trial counsel is willing to represent her, this court will appoint that attorney to act as appellate counsel at public expense until all appellate process is completed. Practice Book #4017. If, however, in the exercise of professional judgment as an officer of the Superior Court, the attorney CT Page 5273 declines to perfect such appeal because, in the attorney's opinion, it lacks merit, she is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of 40 days as permitted by law. Practice Book #4040. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The party will then be informed by the court clerk that she has the balance of the 40 days in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Douglas v. California, 372 U.S. 353 (1963); Fredericks v. Reincke,152 Conn. 501 (1965).
If such procedure satisfies the sixth amendment right to counsel in a criminal proceeding, it is a fortiori appropriate where there are interests of a third party involved: those of the child whose interests are entitled to at least as great a degree of consideration as those of the parent whose right to raise the child are at issue. Even an unsuccessful appeal could delay permanent planning for years since no child may be adopted until the appellate process, which could take years, is exhausted.
Entered at Bridgeport this 9th day of June 1992.
FREDERICA S. BRENNEMAN, JUDGE